## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**
        Plaintiff,

**vs.**                                        **Case No.: 8:23-cr-00304-VMC-CPT**

**STEWART WALTER BACHMANN**
        Defendant.
_____/

## DEFENDANT STEWART WALTER BACHMANN'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE

COMES NOW the defendant, Stewart Walter Bachmann, by and through undersigned counsel, and provides the Court with this sentencing memorandum in advance of the June 18, 2024, sentencing hearing. Mr. Bachmann requests a downward variance sufficient to allow him to be placed on an ankle monitor and ordered to successfully complete the ACTS Residential Treatment Program, a six-month fully in-patient treatment program in Tarpon Springs, FL. As discussed herein, in addition to compelling legal arguments in opposition to enhancements that appear in the Presentence Investigation Report ("PSR") for abuse of trust and number of firearms being scored as relevant conduct, Mr. Bachmann's mental health and substance abuse compel the relief requested.

### I.    FACTUAL OBJECTIONS

Paragraph 20 of the final PSR (Doc. 162) states that law enforcement

1

found pictures on Mr. Bachmann's cell phones that depicted "a storage room displaying several firearms" as well as "a list of to-do items, with one of the items stating, 'Location of offsite – storage of firearms.'" Paragraph 1 of the Addendum to the PSR further provides that "[l]aw enforcement subsequently interviewed employees of the defendant who verified that the offsite storage facility was located at commercial property owned by the defendant." This statement is factually inaccurate[1].

In fact, law enforcement never located an "offsite storage facility," never located the storage room depicted in the above-referenced photographs, and never connected these photographs to Mr. Bachmann, beyond locating the photographs on his cell phone. As well, and as the Government and the Court are aware, between August 6, 2023, and August 8, 2023, multiple units of the Pasco County Sheriff's Office ("PSO), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Federal Bureau of Investigation ("FBI") conducted an extensive, multi day search of Mr. Bachmann's residence and its surroundings pursuant a search warrant. According to a PSO report summarizing the execution of the search warrant, law enforcement "continually surveyed and walked around the residence and property,"

---

[1] Undersigned counsel has emailed the AUSA assigned to this case to see if the government contests the defense position that these facts are inaccurate. The AUSA responded that she will check with the agent and get back to us. In addition to his home, Mr. Bachmann's business location was also the subject of a search warrant, and no storage room as depicted in the photographs were located in either.

including using flying and K9 drones, searching for firearms and ammunition, including items they believed "could be hidden or buried throughout the property." A Florida Department of Law Enforcement ("FDLE") analyst surveyed the property using ground penetrating radar and metal detectors, and no hidden items were located. Multiple K9 units were also used to search the property, including "the woods, dirt piles, small barns and vacant building [sic] on the property" and, after several hours, none of the K9 units located any hidden items on the property or in any structures.

In addition, ATF Special Agent Cosentino interviewed the former manager of WinterBach, LLC[2], James Blashka, and showed him the cell phone pictures of the "storage room". Per the Affidavit in Support of an Application for a Search Warrant for WinterBach, LLC, "when asked if the photographs depicted the 'vault' area in the main structure of [WinterBach], Blashka stated 'no, that's impressive though.'" Further, there is no indication anywhere in the discovery or any evidence that came out in any of three detention hearings, that Mr. Blashka, or anyone else, identified these photographs as associated with Mr. Bachmann or the business.

## II.    GUIDELINES CALCULATION OBJECTIONS

In the initial PSR, United States Probation scored Mr. Bachmann at an

---

[2] WinterBach, LLC is presumably the commercial property owned by Mr. Bachmann that is referenced in the PSR.

offense level of 21. Doc. 157. Both the Government and the defense submitted objections to the Probation Officer and participated in two Position of the Parties meetings. Based on these meetings, the final PSR contains a two-level enhancement for Abuse of Position of Trust/Use of Special Skill pursuant USSG § 3B1.3, and a 10-level Specific Offense Characteristic enhancement pursuant USSG § 2K2.1(b)(1)(E), both of which are objected to, as will be argued below. The addition of these enhancements results is a total offense level at Level 27. Removal of these enhancements would lower the total offense level to Level 15, with a criminal history level I.

Notably, at a hearing before this Court on November 16, 2023, regarding pre-trial detention, two months *after* the execution of a search warrant by ATF agents at the business from which the items were seized that forms the basis for the 10-level enhancement, the following exchange occurred:

> THE COURT: You know, I'm as surprised that the guidelines are as low as they are, Mr. Foster. Let's just assume, for the sake of argument, a guilty plea -- what did I say? -- 18 months, something like that. That's a pretty low sentence, quite frankly. I'm curious as to what the government has to say to that because –
>
> MR. FOSTER: We're talking about two items. We're talking the gravamen of the charge is that he possessed these items and didn't have the tax stamp. He was a federal firearms licensee for many, many years. He gave up the license. Then they found these items, which they say should have been registered but weren't registered.
>
> THE COURT: So even though I don't make detention decisions every day -- as you well know, that's the

4

magistrate judge's call -- and I see these cases, something like this, but there's something that jumps out at me.

MR. FOSTER: What's that?

THE COURT: The length of the sentence.

***

MS. NEWMAN: I think really my last point is in response to the Court's questions about the time the defendant is looking at. I certainly understand the Court's perspective on that. I looked back at my records to see where I had estimated his guidelines at. I don't know if I agree that it's 18 and then after acceptance it's down to 15, or whether it's 18 with acceptance. I'm not sure. But I do agree that it appears that it's not an extended period of time.

Transcript of Hearing on Defendant's Motion to Revoke Magistrate Judge's Order Denying Defendant's Motion to Reopen Detention Hearing, November 16, 2023, at 22, 46.

Mr. Bachmann respectfully objects to both enhancements for the following reasons.

### a. The Two-Level Enhancement For Abuse Of Position Of Trust/Use Of Special Skill Does Not Apply Because Under Binding Eleventh Circuit Precedent Mr. Bachmann Did Not Occupy A Position Of Trust, And Because Mr. Bachmann Used No Special Skill In Facilitating The Instant Offense.

In order for the two-level enhancement to apply pursuant to USSG § 3B1.3, the Government must prove, by a preponderance of the evidence, that either the defendant abused a position of trust or that the defendant used a "special skill" "in a manner that significantly facilitated the commission or

concealment of the offense." USSG § 3B1.3. "[A] special skill 'significantly facilitate[s]' an offense when it confers 'an advantage' used 'to commit the crime.'" *United States v. Martinez*, 509 Fed. Appx 889, 894 (11th Cir. 2013) (unreported and per curiam), *quoting United States v. Campa*, 529 F.3d 980, 1018 (11th Cir.2008).

### i. Abuse of Position of Trust

First, Mr. Bachmann did not hold a position of public trust or private trust. Indeed, the Eleventh Circuit has held that a federal firearms dealer, as Mr. Bachmann was, does not occupy such a position of trust required for application of the abuse of position of trust enhancement pursuant § 3B1.3. *United States v. Louis*, 559 F.3d 1220, 1225 (11th Cir. 2009).

In considering this issue as a matter of first impression, the Eleventh Circuit in *Louis* adopted the reasoning of Judge Ripple's concurring opinion in *United States v. Podhorn*, 549 F.3d 552 (7th Cir. 2008). In the *Podhorn* concurrence, Judge Ripple opined that a federal firearms license does not itself create a position of trust, and that "a license creates no such position because the 'perfunctory licensing qualifications and strict recordkeeping and reporting requirements make it 'difficult to determine from [the] face [of the license] how [it] bestows on its holder the type of substantial discretion and responsibility necessary to apply [the enhancement].'" *Louis*, 559 F.3d at 1226-27, quoting *Podhorn*, 549 F.3d at 561–64. The Eleventh Circuit agreed with Judge Ripple's

that "a federal firearms licensee does not occupy a 'position of public trust' based on the three factors mentioned in section 3B1.3: professional judgment, discretion, and deference." *Id*. at 1227.

The Court further explained that only "[f]iduciaries and employees of a public or private agency who exercise considerable discretion are subject to the [abuse of position of trust] enhancement." *Id*. at 1226. Considering these three § 3B1.3 factors, the Eleventh Circuit found that federal firearms licenses exercise little discretion.

> The government requires the dealer to take certain steps before completing a transaction, keep certain records of transactions, and transact only in certain places and with certain people. Dealers may not sell firearms outside any of these limitations. Dealers are also afforded little, if any, "professional deference."

*Id*. at 1227-28. The Eleventh Circuit concluded that "dealers exercise no professional judgment about their compliance with federal law." *Id*. at 1228.

Accordingly, the Eleventh Circuit's decision in *Louis*[3] is binding circuit precedent for the position that Mr. Bachmann did not occupy a position of trust as a federal firearms dealer[4]. The Probation Office admits this in PSI Addendum paragraph 3 by "agree[ing] that merely being a federal firearms

---

[3] The *Louis* Court did not consider the special skill enhancement under § 3B1.3.

[4] Since Mr. Bachmann did not occupy a position of trust under circuit precedent, the Probation Office's conclusion in paragraph 30 of the Final PSR and in paragraph 3 of the PSI Addendum that he "breach[ed] trust" must be struck.

dealer is not reason enough to apply the 2-level enhancement found at USSG § 3B1.3."

### ii. Use of "Special Skill"

In addition, Mr. Bachmann also did not use a special skill in a manner that significantly facilitated the commission or concealment of the instant firearms possession offenses. A special skill is defined in Application Note 4 as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."

While the Eleventh Circuit has not specifically addressed the precise issue of whether the "special skill" enhancement applies to possession of firearms offenses[5] such as the counts of conviction here, the Eleventh Circuit generally has affirmed application of this enhancement to defendants engaging in crimes that could only be accomplished through the use of a special skill. *See, e.g.*, *United States v. Cordero-Castro*, 688 Fed. Appx 633 (11th Cir. 2017) (unreported and per curiam) (defendant used a "special skill" when he stole

---

[5] In *United States v. Van Linda*, 707 Fed. Appx 622, 625 (11th Cir. 2017) (unreported and per curiam), the Eleventh Circuit affirmed the application of the special skill enhancement to a defendant who pled to conspiracy to engage in the business of unlicensed dealing of firearms in violation of 18 U.S.C. 371; unlicensed dealing in firearms in violation of 18 U.S.C. 922(a)(1)(A); and possession of an unregistered firearm in violation of 26 U.S.C. 5861(d), finding that the defendant's "vast knowledge of weaponry" significantly facilitated his business of unlicensed dealing in firearms. The Court did not find or explain how, if at all, this special skill significantly could facilitate possession of an unregistered firearm charge.

and piloted a yacht, where the average person could not have walked off the street and piloted a vessel such as the one in question because of the size of the vessel, certain startup and battery procedures, and need to switch from shore power to main breaker, and thus a two-level increase in his offense level was warranted); *see also, United States v. Exarhos*, 135 F.3d 723 (11th Cir. 1998) (special skills were required to conceal thefts of parts and of cars involved in defendants' professional auto theft and renumbering scheme, where defendants knew where identifying symbols and numbers were located, how to remove or obscure them, how effectively to avoid anti-theft devices, and how efficiently to dismantle vehicles and purloin parts).

Other courts have reversed the application of special skill enhancements to defendants convicted of similar gun crimes who were federal firearms dealers as Mr. Bachmann was. In *United States v. Hinshaw*, 166 F.3d 1222 (10th Cir. 1999) (unreported), the defendant, "a gun collector who possesses a total of sixty-five firearms, and [held] a federal firearms dealer's license", was convicted at trial of delivering a firearm to a felon in violation of 18 U.S.C. 922(d). *Id*. at *1. At sentencing, the defendant made several arguments against abuse of trust[6] and two arguments against use of special skill: (1) he did not use a special skill "since delivering a firearm to a convicted felon is something

---

[6] For the purpose of enhancing Mr. Hinshaw's sentence, the sentencing judge only found that he possessed a "special skill" and did not find that he abused a position of trust. *Hinshaw*, 166 F.3d at 3.

any person could do" and (2) "his innocent purchase of the firearm with his license did not facilitate the offense because he discovered Mr. Mead's conviction only after purchasing the gun." *Id.* at *3.

The Tenth Circuit analyzed the six requirements in 18 U.S.C. 923(d)(1) to become licensed as a federal firearms dealer and concluded that "[n]one of these requirements or qualifications appear to require any 'developed or acquired aptitude of ability' in firearms use or trade." *Id.* at *4. Next, the Tenth Circuit considered the fact that the defendant's "federal firearms license enabled him to obtain the gun without filling out ATF forms and waiting the required five days." However, the Tenth Circuit concluded that "[t]he mere fact that Mr. Hinshaw holds a firearms license giving him immediate access to a gun is not enough to demonstrate the kind of 'special skill' contemplated under USSG 3B1.3. The special skills involved in licensing pilots, lawyers, doctors, and accountants are not comparable to the somewhat perfunctory qualifications the law requires to obtain a firearms license or comply with ATF record and transaction requirements." *Id.* at *4.

Similarly, in *United States v. Woodbridge*, 52 F.3d 336 (9th Cir. 1995) (unreported per curiam memorandum), a federal firearms licensed dealer appealed his convictions at trial of 12 counts of possessing machine guns in

violation of 18 U.S.C. 922(o)[7] and 924(a)(2). The Ninth Circuit found that the district court's adoption of the PSR's conclusion that the defendant abused a position of trust or used a special skill in committing this possession offense "was clearly erroneous" for these reasons:

> In the case at bar, there is nothing in the record to suggest that Woodbridge's possession offenses were 'significantly facilitated' either by his expertise or his status as a firearms licensee. The Government presented no evidence that Woodbridge actually manufactured or assembled the charged weapons. Further, the record contains no indication that Woodbridge's license enabled him in some way to acquire the illegal weapons and parts. Thus, the district court erred in enhancing Woodbridge's sentence under 3B1.3.

*Id*. at *5.

The appellate panels in both *Hinshaw* and *Woodbridge* reversed the district court's application of a 3B1.3 enhancement based on the lack of evidence presented proving how the gun crimes committed by those firearms dealers were "significantly facilitated" by their alleged special skill. The Tenth Circuit in *Hinshaw* even "conclude[d] that the sentencing judge's finding that a federal firearms license is, in and of itself, a 'special skill', is based on nothing more than a mere conclusion." *Hinshaw*, 166 F.3d at *5.

It must be kept in mind that Mr. Bachmann is not charged, or even accused, of manufacturing either of the items that form the basis for the

---

[7] Mr. Bachmann also pled guilty to violating 18 U.S.C. § 922(o) in Count One.

offenses of conviction – he is charged only with possessing them. Also, as to the Royal Arms firearm, typically, a metal sear is inserted into the hole that is drilled into the weapon in order to permit it to fire fully automatic. No sear was found here. This is not to contest the illegality of the possession, as Mr. Bachmann persists in his plea, but only to say that typically an operational converted AR-15 would be drilled and have a sear inserted.

Here too, the Probation Office's assertion in PSR paragraph 30 and paragraph 3 of the PSR Addendum that Mr. Bachmann used "specialized knowledge" to possess a machinegun and to possess a firearm which lacked a serial number is merely conclusory. The plea agreement (Doc 146) makes clear that all Mr. Bachmann had to know to be guilty of Count One was that what he possessed was a machinegun and that all he had to know to be guilty of Count Three was that this machinegun lacked a serial number. But a person does not need "specialized knowledge" to know what a machinegun is and to know that a firearm lacks a serial number, or to possess same. Therefore, any "specialized knowledge" possessed by Mr. Bachmann did not significantly facilitate his commission of these simple possession crimes.

As the Tenth Circuit held in *Hinshaw*, Mr. Bachmann's former "possession of a federal firearms license itself is not a 'special skill' for the purpose of enhancement under USSG 3B1.3." *Id*. at *5. In addition, as in *Woodbridge*, there is no record proof which the Court could rely on to find that

12

Mr. Bachmann's "possession offenses were 'significantly facilitated' either by his expertise or his status as a firearms licensee." *Woodbridge*, 52 F.3d at *5. Indeed, while Mr. Bachmann previously held a federal firearms license that would allow him to legally possess machineguns, he pleaded guilty to possessing machineguns **<u>after</u>** his firearms license lapsed, further evidencing that no special skill was required for Mr. Bachmann to possess machineguns or to possess firearms that were not identified by a serial number.

In conclusion, the 3B1.3 enhancement should not be applied because under Eleventh Circuit precedent Mr. Bachmann did not abuse a position of trust and because he did not use a special skill to facilitate the simple gun possession offenses to which he pled guilty.

**b. The Ten-Level Number Of Firearms Enhancement Should Not Be Applied Under § 2K2.1(B)(1) Because The Items Characterized As "Firearms" For The Purpose Of This Enhancement Are Not In Fact Firearms Under The Gun Control Act Of 1968.**

As briefly discussed in Defendant's First Motion to Continue Sentencing Hearing (Doc. 158), the initial PSR discusses over 300 items that were seized from the defendant's business during the execution of a search warrant in September 2023. The Final PSR includes a ten-level Specific Offense Characteristic enhancement, pursuant to USSG § 2K2.1(b)(1)(E), which is applied if the offense involves 200 or more firearms.

The items in question include over 300 completely flat and partially bent

pieces of sheet metal (hereinafter, "incomplete lowers"). The Government's position is that these incomplete lowers constitute firearms and machine guns. Pursuant to its own classification of these items as firearms and machine guns, the Government's position is that the Defendant's offense level should be determined by applying USSG § 2K2.1(b)(1)(E), which would add an additional 10 offense levels for possession of "200 or more" firearms. Doc. 158, at ¶5. Mr. Bachmann objects both to this ten-level enhancement as well as the classification of these items as firearms and machine guns for purposes of the enhancement under USSG § 2K2.1(b)(1)(E).

For background, and as briefly discussed in Defendant's First Motion to Continue Sentencing Hearing (Doc. 158), the Gun Control Act ("GCA") was signed into law in 1968 and codified at 18 U.S.C. § 921, for the purpose of ensuring that the manufacture and sale of firearms are regulated as intended and providing definitions and regulations of firearms. Pursuant 18 U.S.C. § 921(a)(3), the term "firearm" means:

> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; *(B) the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

(emphasis added). The GCA additionally expanded the scope of the National

Firearms Act ("NFA")[8], which is codified at 26 U.S.C. § 5801, to include, among other things, machine gun frames and receivers. Pursuant to 26 U.S.C. § 5845(b), the term "machinegun" means:

> [A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. *The term shall also include the frame or receiver of any such weapon*, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

(emphasis added).

Neither the GCA nor the NFA explicitly defined a "frame or receiver" so, in 1978, ATF defined a "frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. 478.11. This definition persisted for over 40 years.

Then, in April 2022, ATF issued a Final Rule, which redefined certain terms from the GCA, including greatly expanding the definition of "frame or receiver." This expanded definition includes "partially complete, disassembled, or nonfunctional frame or receiver" within the definition of frame and receiver:

---

[8] The NFA was originally enacted in 1934 to impose a tax on the making and transfer of firearms defined by the Act, as well as an occupational tax on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms.

The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon ( e.g., unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

27 C.F.R. 478.12(c).

In August 2022, a number of individuals and entities jointly filed a petition in the Northern District of Texas claiming that "two portions of the Final Rule, which redefine 'frame or receiver' and 'firearm,' exceeded ATF's congressionally mandated authority." *VanDerStok v. Garland*, 86 F.4th 179, 186 (5th Cir. 2023), cert. granted, 144 S. Ct. 1390 (2024). The district court granted several preliminary injunctions, finding that "ATF's new definition of 'frame or receiver' is facially unlawful because it included 'firearm parts that are *not yet* frames or receivers' in contravention of Congress's clear language

16

in the GCA." *Id*., quoting *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 578–79 (N.D. Tex. 2022), opinion clarified, No. 4:22-CV-00691-O, 2022 WL 6081194 (N.D. Tex. Sept. 26, 2022) (emphasis in original).

The district court granted summary judgment to the plaintiffs and vacated the ATF Final Rule in its entirety, holding that "the Final Rule's amended definition of 'frame or receiver' does not accord with the ordinary meaning of those terms and is therefore in conflict with the plain statutory language." *Id*. The case was appealed to the Fifth Circuit and, ultimately, in November 2023, the Fifth Circuit ruled in favor of the plaintiffs, holding that the ATF's expanded definitions of "frame and receiver" and "firearm" exceeded its statutory authority[9]. In its opinion, the Fifth Circuit provided that, in promulgating its Final Rule, ATF "attempted to take on the mantle of Congress to 'do something' with respect to gun control. But it is not the province of an executive agency to write laws for our nation. That vital duty, for better or for worse, lies solely with the legislature." *Id*. at 197. *See, also, California v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 2024 WL 779604 (N.D. Cal., February 26, 2024) (following reasoning of the *VanDerStok* ruling).

On April 22, 2024, the Supreme Court granted certiorari review on this

---

[9] The Fifth Circuit did not uphold the lower court's invalidation of the entire ATF Final Rule, but upheld the invalidation of the ATF's expanded definition of "frame or receiver," which definition is directly at issue for purposes of Mr. Bachmann's sentencing hearing.

issue, however, based on the briefing schedule, no decision will be reached until after Mr. Bachmann's sentencing date[10]. It is entirely possible, and very likely, that the Supreme Court will affirm the Fifth Circuit opinion, thereby invalidating the 2022 ATF rule that the PSR relies upon in scoring these mostly flat pieces of metal as relevant conduct. It is plain that neither the Court, the defendant, or the government would want a result where a defendant is required to serve additional prison time for conduct determined not to be illegal by the Supreme Court. That would truly be a miscarriage of justice.

The incomplete lowers, 210 of which are *completely flat pieces of metal*, that were seized from Mr. Bachmann's business were examined by the ATF. ATF found all 317 incomplete lowers to be "receivers" under 27 C.F.R. 478.12(c). As "receivers," ATF then characterized all 317 incomplete lowers as firearms, and 313 as machineguns[11]. The incomplete lowers would not meet the definition of "frame or receiver" under the 1978 definition, which is what remains after the 2022 definition is struck, as they do not contain the three

---

[10] It is worth noting that legal scholars note that decisions in recent years demonstrate the Supreme Court's historical and increasing skepticism of administrative power and increasing willingness to question government regulation, and expect the 2024 Supreme Court term may bring change to administrative law, including a decision whether to overrule the Chevron doctrine. *See*, https://www.reuters.com/legal/legalindustry/2024-supreme-court-term-may-bring-more-change-administrative-law-2024-04-23/.

[11] Four incomplete lowers were identified by the ATF as semi-automatic "receivers", and not machinegun "receivers".

elements of a receiver. Accordingly, Mr. Bachmann objects to the ten-level enhancement for the following reasons.

> ### i. When Applying The 2K2.1(b)(1) Number Of Firearms Enhancement, The Court Must Apply Only The Statutory Definition Of "Firearm" In 18 U.S.C. 921(a)(3), Which Includes "Frames Or Receivers" But Excludes "Partially Complete, Disassembled, Or Nonfunctional Frames Or Receivers" and Frame Or Receiver Parts Kits

The number of firearms enhancement in USSG 2K2.1(b)(1) applies "[i]f the offense involved three or more firearms …." Under Application Note 1, "firearm" is defined as having "the meaning given that term in 18 U.S.C. § 921(a)(3)." As noted, § 921(a)(3) in turn defines "firearm" as meaning "(A) any weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device."

As discussed, in its 2022 Final Rule, which is now codified in 27 CFR 478.12, ATF substantially expanded the definition of "frame or receiver" to include "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun [or] breech blocking or sealing component

of a projectile weapon other than a handgun ....." 87 Fed.Reg. at 24739 (April 26, 2022). The Final Rule also expands the definition of "firearm" to include "a weapon parts kit that is designed to or may readily be converted, assembled, restored, or otherwise converted to expel a projectile by action of an explosive." 87 Fed.Reg. at 24728.

This Court is required by application note 1 to apply the 2K2.1(b)(1) number of firearms enhancement only to "frames or receivers", not to partially completed frames or receivers, because the key term "firearm" used to calculate the number of firearms involved is limited to the definition of that term in 18 U.S.C. 921(a)(3). The Sentencing Commission knew that "the meaning given [firearm] in 18 U.S.C. 921(a)(3)" included "frames or receivers", but did not include partially completed frames or receivers – and yet chose to determine the number of firearms for purposes of the 2K2.1(b)(1) enhancement based on this statutory (not regulatory) definition which excludes partially completed frames or receivers.

This Court, respectfully, has no authority to rewrite the definition of "firearm" chosen by the Sentencing Commission in Application Note 1. As the Sentencing Commission stated clearly and explicitly in its Primer on Firearms Offenses (2023 edition), published after the ATF Final Rule was promulgated in 2022, "[t]he [2K2.1] guideline uses the definition of 'firearm' in section 921(a)(3) of title 18." The Commission was aware of the 2022 ATF Final Rule

when it published its Primer on Firearms Offenses in 2023 and yet chose not to change its longstanding definition of "firearm" based solely on the language in 18 U.S.C. 921(a)(3) which excludes partially completed frames or receivers.

The Probation Office and the Government assume that the Court can determine the number of firearms for purposes of applying the 2K2.1(b)(1) enhancement by applying the new regulatory definition of "frame or receiver" in the ATF Final Rule. That assumption is wrong. Rather, the Court is bound to apply the 2K2.1(b)(1) enhancement based only on the definition of "firearm" in 18 U.S.C. 921(a)(3) – which both includes "frames or receivers", but also excludes "partially completed frames or receivers." *See United States v. Nieves-Diaz*, 99 F.4th 1, 10 (1st Cir. 2024) (reversing application of 4-level enhancement under 2K2.1(b)(6)(B) for using or possessing any firearm in connection with another felony offense based on the defendant's possession of a "chip", which when installed on a Glock pistol renders it capable of operating as a fully automatic weapon, because "921(a)(3) does not include a 'chip' in its definition of 'firearm'); *United States v. Hixson*, 624 F.Supp.3d 930, 937-38 (N.D. Ill. 2022) (declining to apply the 2K2.1(b)(1) number of firearms enhancement based on Glock switches which were "statutorily defined machineguns but not 'firearms' under the Guidelines Manual").

> **ii.  If it Considers The ATF Final Rule Redefinition of "Frame of Receiver" At All, The Court Must Make Its Own Determination of the Number of Firearms The Defendant Possessed When Applying the 2K2.1(b)(1) Number of Firearms Enhancement Without Deferring to the ATF Final Rule**

Two Eleventh Circuit cases establish that this Court must make its own interpretation of the statutory "frame or receiver" language in 18 U.S.C. § 921(a)(3) and not merely defer to ATF's greatly expanded definition in the 2022 Final Rule.

In *United States v. McIlwain*, 772 F.3d 688 (11th Cir. 2014), the Eleventh Circuit had to interpret the meaning of 18 U.S.C. § 922(g)(4), which makes a person's "knowing recei[pt] and possess[ion], in and affecting commerce, [of] a firearm … after being committed involuntarily to a mental health facility" a federal crime.  Although ATF had promulgated a definition of "committed to a mental institution" in 27 CFR 478.11, the Eleventh Circuit held that "this Court is not bound or required to defer to the ATF's regulations …." *McIlwain*, 772 F.3d at 694. To the contrary, the Eleventh Circuit adopted ATF's definition only because it "f[ound] these regulations helpful and persuasive" after considering how five other circuits had interpreted this statutory language. *Id.*

In *Byrd v. Hasty*, 142 F.3d 1395 (11th Cir. 1998), the Eleventh Circuit had to decide which crimes were "nonviolent offenses" for purposes of eligibility for a sentence reduction of up to one year under 18 U.S.C. § 3621(e) for

completing a 500-hour residential drug abuse program ("RDAP"). Defendant Byrd had been convicted at trial of conspiracy to distribute cocaine and possession with intent to distribute cocaine, but had been acquitted of using or carrying a firearm in relation to a drug trafficking offense. At sentencing, Byrd received a two-level enhancement because a .22 caliber rifle was found in the residence where the drug sale took place. *Byrd*, 142 F.3d at 1396.

Through a Program Statement, the Bureau of Prisons determined that "a conviction under 21 U.S.C. § 841 or § 846 is deemed a crime of violence if the sentencing court increased the base offense level under the Sentencing Guidelines pursuant to USSG 2D1.1(b)(1) for possession of a dangerous weapon during the commission of [a] drug offense." *Byrd*, 142 F.3d at 1397. Accordingly, the district court held that Byrd was not eligible for an RDAP sentence reduction. However, on appeal, the Eleventh Circuit found BOP's interpretation of the statutory language to be "wholly unpersuasive", in part because it "is simply in conflict with the statute's plain meaning." *Byrd*, 142 F.3d at 1398. Instead, the Eleventh Circuit "adopt[ed] the reasoning of those courts that have found that the BOP exceeded its authority." *Id*.

Both *McIlwain* and *Byrd* demonstrate that this Court cannot simply defer to ATF's greatly expanded Final Rule definition of "frame or receiver" in deciding how to apply the 2K2.1(b)(1) enhancement in this case. Rather, this Court must determine whether the Final Rule's greatly expanded definition is

23

or is not persuasive in light of the much more limited statutory definition of "firearm" language in 18 U.S.C. § 921(a)(3).

### iii. The Final Rule's Expanded Definition of "Frame or Receiver" Should Be Rejected as Not Persuasive In Light Of The Much More Limited Definition of "Firearm" In 18 U.S.C. § 921(a)(3)

As an initial matter, "ATF's inclusion [in the 2022 Final Rule] of 'partially complete, disassembled, or nonfunctional' frames and receivers materially deviates from past definitions of those words to encompass items that were not originally understood to fall within the ambit of the [Gun Control Act.]" *VanDerStok*, 86 F.4th at 189. "Both a 'frame' and a 'receiver' had set, well-known definitions at the time of the enactment of the [Gun Control Act] in 1968." *Id*. at 188.  For example, "[i]n 1971, Webster's Dictionary defined a 'frame' as 'the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm' and a 'receiver' as 'the metal frame in which the action of a firearm is fitted and which the breech end of the barrel is attached.'" *Id*. at 188. "As is apparent from a comparison of the dictionary definitions and the regulatory definition, ATF's previous understanding of 'frame or receiver' closely tracked the public's common understanding of such terms at the time of enactment" of the Gun Control Act in 1968. *Id*. at 189. Because "words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute", "the proposed definition

24

[in the 2022 Final Rule] is an impermissible extension of the statutory text approved by Congress." *Id*.

Moreover, a comparison of the definition of "firearm" with the definition of "frame or receiver" in the Gun Control Act demonstrates why ATF's Final Rule impermissibly adds language Congress did not intend to be added. The definition of "firearm" in 18 U.S.C. § 921(a)(3)(A) "includes flexible language such as 'designed to or may readily be converted to expel a projectile by the action of an explosive." *Id*. at 189. In sharp contrast, "the subsection immediately thereafter, which contains the term 'frame or receiver', does not include such flexibility." *Id*. "[T]he exclusion of the phrase 'designed to or may readily be converted' in the 'frame or receiver' subsection" must therefore be interpreted as "purposeful, such that ATF cannot add such language where Congress did not intend it to exist." *Id*.

In addition, the Final Rule's greatly expanded definition of "frame or receiver" ignores the language of Section 921(a)(3) which requires that firearms be a "weapon" and that frames or receivers be "of any such weapon." "This language from the [Gun Control Act] underscores that a receiver is not a weapon in and of itself but rather is *part* of a weapon." *California v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 2024 WL 779604, *17 (N.D. Cal., February 26, 2024) (emphasis in original). However, because "the ordinary meaning of weapon is 'something (such as a club, knife or gun) used to injure,

25

defeat, or destroy", "a partially completed receiver does not satisfy that definition." *Id.*

For all these reasons, the provisions of the 2022 Final Rule "that redefines 'frame or receiver' to include partially complete, disassembled, or nonfunctional frames or receivers" "clearly conflicts with the plain language of the GCA" and therefore "constitutes unlawful agency action." *VanDerStok*, 86 F.4th at 190.

Similarly, "ATF has no authority whatsoever" to regulate weapon parts kits, as permitted by the Final Rule, "because Congress explicitly removed such authority when it enacted the [Gun Control Act]":

> The GCA's predecessor statute, the Federal Firearms Act, had specific language that authorized regulation of "any part or parts of" a firearm. *See* Federal Firearms Act of 1938, Ch. 850, Pub.L. No. 75-785, 52 Stat. 1250 (1938) (repealed 1968). However, Congress *removed* this language when it enacted the GCA, replacing "any part or parts" with just "the frame or receiver of any such weapon." Thus, the GCA does not allow for regulation of all weapon parts; rather, it limits regulation to two specific types of weapon parts. The Final Rule ignores this change completely and improperly rewrites and expands the GCA where Congress clearly limited it.

*VanDerStok*, 86 F.4th at 191 (emphasis in original).

This Court cannot rely on the 2022 Final Rule's greatly expanded definition of "frame or receiver" or its inclusion of "weapon parts kits" in applying the 2K2.1(b)(1) number of firearms enhancement in this case for

26

several reasons. First, the Final Rule's definition is hardly "helpful and persuasive", as required by *McIlwain*. Second, the Court cannot sentence a defendant to years of additional imprisonment based on what the Fifth Circuit has aptly labeled "unlawful agency action."

Accordingly, this Court should apply the definition of "frame or receiver" which ATF used for 44 years (between 1978 and 2022)[12].  Under this definition, none of the items seized from Mr. Bachmann's business constitute receivers, and therefore do not constitute firearms or machineguns[13]. As there are no additional firearms to be considered, the enhancement pursuant 2K2.1(b)(1)(E) does not apply.

> ### c. Even If Probation's Number Of Firearms Enhancement Under 2K2.1(b)(1) Is Properly Based On "Firearms" As Defined By 18 U.S.C. 921(a)(3), This Enhancement Should Not Be Applied Here Because The 316 Partial Receivers Seized By Search Warrant On September 27, 2023 Were Not "Involved" In The Counts Of Conviction.

The 2K2.1(b)(1) number of firearms enhancement "is limited to firearms involved in the offense[14]", *United States v. Acosta*, 2010 WL 5055843, *1 (M.D.

---

[12] Research has located **NO** reported or unreported cases on Westlaw in which a 2K2.1(b)(1) number of firearms enhancement has been applied based on a "partially complete, disassembled, or nonfunctional frame and receiver" or based on 27 CFR 478.12(c), the CFR citation for the 2022 ATF Final Rule.

[13] An expert witness whose identity has been disclosed to the Government will be available to testify to same at the Sentencing Hearing.

[14] It is worth noting that, in light of a recent amendment to the sentencing guidelines that precludes the consideration of acquitted conduct for purposes of calculating the advisory sentencing guidelines, several current and former justices of the Supreme Court believe that

Fla., December 3, 2010) (Presnell, J.), which under 1B1.3 includes acts committed by the defendant "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

Here, the offenses of conviction (Counts One and Three) both ended on August 6, 2023, according to the Indictment, when a search warrant was executed on Mr. Bachmann's residence as stated in PSR paragraph 15. However, the "firearms" on which Probation bases the 2K2.1(b)(1) enhancement were seized by a second search warrant on a commercial property over a month and a half later, on September 27, 2023, according to PSR paragraph 22.

Even assuming that the incomplete lowers seized on September 27, 2023 qualify as "firearms" upon which a 2K2.1(b)(1) enhancement can be based, any alleged constructive possession of those incomplete lowers by Mr. Bachmann in late September 2023 obviously was not part of his preparation to possess machineguns and firearms without a serial number which ended on August 6, 2023, or his efforts to avoid detection of those machine guns/firearms which

---

the presumption of innocence should extend not only to acquitted conduct, but also to dismissed and uncharged conduct. Justice Alito, for example, stated that "there is no relevant difference … between acquitted conduct and uncharged conduct." Justices Kavanaugh, Gorsuch, Jackson, Thomas, and Scalia have echoed similar sentiments. *See*, "End of Acquitted Conduct Sentencing Can Spark More Reform", Mark Allenbaugh and Alan Ellis (May 6, 2024), quoting *McClinton v. United States* (June 30, 2023) (Alito, J., concurring in denial of certiorari).

also ended on August 6, 2023. *Acosta*, at *2 ("Even assuming that Acosta illegally exported or trafficked the Glocks and other legal firearms he bought, this exportation and/or trafficking was not part of (1) his preparation to possess short-barreled rifles and machineguns; (2) his actual possession of short-barreled rifles and machineguns; or (3) his efforts to avoid detection of his possession of short-barreled rifles and machineguns").

In addition, the incomplete lowers seized on September 27, 2023 also do not qualify as relevant conduct because that alleged constructive possession did not "occur[] within the time period covered by the indictment." *United States v. Anton*, 353 Fed.Appx. 343, 345-46 (11th Cir. 2009) (unpublished and per curiam) (applying 2K2.1(b)(1) enhancement to firearms defendant possessed "within the time period covered by the [felon-in-possession] indictment").

Finally, the incomplete lowers seized on September 27, 2023 do not qualify as relevant conduct because neither "the temporal [nor] spatial proximities of the two illegal firearms possessions are close enough" to make possession of the incomplete lowers relevant conduct of the Counts One and Three offenses of conviction. *United States v. Aboite*, 2023 WL 6803462, *4 (11th Cir., October 16, 2023) (unreported and per curiam). In *Aboite*, the defendant's possession of a .40 caliber pistol in a dismissed count was upheld to be relevant conduct to his offense of conviction of possessing a .380 caliber

pistol because both firearms "were possessed at the same time – at the time of arrest" (the temporal proximity), and because both firearms "were possessed in effectively the same place" (the spatial proximity). *Id*.

Here, however, neither the required temporal proximity nor the required spatial proximity exists according to PSR paragraphs 15 and 22 and Counts One and Three of the Indictment. Indeed, the execution of the search warrant on September 27, 2023, occurred almost two months after Mr. Bachmann was taken into law enforcement custody, and while his then-employees continued operating the business. Significantly, on August 10, 2023, days after Mr. Bachmann was taken into custody, a PSO detective went to the business to speak with Mr. Bachmann's employees. At this time, one of the employees offered to give the detective a tour of the facility, and explained to the detective that, since the company no longer occupied an FFL, they were making semi-automatic "kits." Certainly, if Mr. Bachmann's employees believed they were doing anything illegal, they would not have voluntarily provided law enforcement with unfettered access to their facilities, and they would not have remained in his employ. There is simply insufficient factual support to sustain this enhancement. *See*, *e.g.*, *United States v. Smith*, 2009 WL 1311850, at *4 (M.D. Ala. May 12, 2009) (unreported) (In order for the government to prove relevant conduct, the government must prove by a preponderance of the evidence that the defendant possessed the requisite mental state).

30

For all these reasons, the 2K2.1(b)(1) enhancement should not be applied here even if the incomplete lowers seized on September 27, 2023 somehow constitute "firearms" as defined by 18 U.S.C. 921(a)(3).

### III.   GROUNDS FOR REQUESTED DOWNWARD VARIANCE

#### a. Mr. Bachmann's Severe Mental Health And Substance Abuse Issues Warrant A Downward Variance.

Separately, Mr. Bachmann moves this Court for a downward variance sufficient to permit him to be placed on an ankle monitor and ordered to successfully complete the ACTS Residential Treatment Program, a six-month in-patient treatment program in Tarpon Springs, FL, based on his serious mental health and substance abuse issues.

The basis for the instant matter arose out of a drug-induced mental health episode in August 2023, when Mr. Bachmann, while he was hallucinating, called 911 to report that he was being kidnapped by CIA agents whom he believed were going to frame him for an act of mass violence. Mr. Bachmann was subsequently Baker Acted. It was quickly discovered that this isolated incident was caused by Mr. Bachmann's severe, long-term alcohol and substance abuse which, among other factors, caused him to hallucinate.

As discussed in the Final PSR, Mr. Bachmann has been evaluated by a psychologist and two psychiatrists, all of whom have diagnosed Mr. Bachmann with various alcohol and substance abuse disorders and all of whom have

characterized the August 2023 incident as isolated or resolved. Each of the doctors has also recommended alcohol and substance abuse treatment.

Mr. Bachmann has been abusing alcohol and substances from a young age. He was arrested as early as the age of 18 for possession of narcotics and was discharged from the military for drug use, despite having earned several decorations and awards for his accomplishments in the service. In July 2022, Mr. Bachmann was accused of domestic battery when he was under the influence of alcohol and other substances. When law enforcement made contact with him, he was found unresponsive due to an overdose and was administered multiple doses of Narcan before being hospitalized.

Mr. Bachmann earned an engineering degree in Germany and took over his father's manufacturing company. After his father fell ill, Mr. Bachmann took over the family business and was very successful in expanding the business domestically and internationally. Despite his success as a businessman, Mr. Bachmann's alcohol and substance abuse inhibited him from continuing in his success, and the company had to be sold. While Mr. Bachmann has attempted to open other companies, his dependencies have caused him to make poor choices. In the instant matter, where he has been in custody since August 5, 2023, Mr. Bachmann's businesses have failed, again as a result of drug and alcohol use.

Courts, including those within the Eleventh Circuit, often consider a

defendant's mental health, including substance abuse disorders, as a factor when granting a downward variance. "[I]n meting out appropriate punishment, the court should make a good-faith attempt to ensure that the defendant is not inappropriately punished for having a disease, and, to the extent appropriate, receives rehabilitative treatment." *United States v. Mosley*, 277 F. Supp. 3d 1294, 1296 (M.D. Ala. 2017).

In *United States v. Carter*, after the defendant pleaded guilty to being a felon in possession of a firearm, Judge Thompson granted a downward variance based on the defendant's mental health and substance abuse issues. 506 F. Supp. 3d 1204, 1205 (M.D. Ala. 2020). In reaching its decision to grant the downward variance, the Court considered the testimony of a forensic psychologist, who testified that the defendant's "only chance at turning his life around would be through long-term inpatient treatment for both his substance-use disorders and his underlying trauma." *Id*. at 1212. The forensic psychologist further opined that, "[w]ithout inpatient treatment addressing both [the defendant's] substance abuse and trauma, … [the defendant] will all but inevitably continue to maintain his addictions and related criminal activities." *Id*.

Judge Thompson further considered the psychologist's recommendation that the defendant required treatment as consistent with the 18 U.S.C. § 3553(a) factors:

> Put in the context of § 3553(a)(2), these findings convinced the court that protracted incarceration would do little to deter subsequent criminal conduct by Carter; until he receives the treatment he needs, his addictions and criminality will remain largely beyond his control. *See* 18 U.S.C. § 3553(a)(2)(B). For much the same reason, the court was convinced that getting Carter into treatment as soon as possible was the best way to protect the public; his criminality will end only when his substance-use disorders and underlying trauma are addressed. *See id.* § 3553(a)(2)(C). A downward variance allows the court to provide Carter with critical care and treatment in the most effective manner because of the unsuitability discussed above of the correctional setting for giving him the drug and mental-health treatment he requires. *See id.* § 3553(a)(2)(D).

*Id.* at 1212–13.

Three doctors who have evaluated Mr. Bachmann have reached the same conclusion as the psychologist in *Carter*, that Mr. Bachmann requires intensive alcohol and drug abuse treatment. Dr. Tarbox previously testified before the Court that Mr. Bachmann is a low risk for recidivism, but that substance use could potentially lead to another episode of psychosis like the one that ultimately led to the instant criminal charges to which Mr. Bachmann pleaded guilty. Dr. Barnett, whose report is attached to the Final PSR, also opined that he is unlikely to experience another psychotic episode so long as he abstains from substance use[15].

Significantly, in the Final PSR, the Probation Office also recommends a downward variance specifically based on Mr. Bachmann's mental and

---

[15] Dr. Barnett will be available to testify at the sentencing hearing.

emotional health concerns.

## IV.    CONCLUSION

For all the reasons discussed, Mr. Bachmann provides to this Court that his offense level is 15. It is respectfully requested that Mr. Bachmann receive a sufficient downward variance from Level 15 to allow him to be placed on an ankle monitor and ordered to successfully complete the ACTS Residential Treatment Program, a six-month in-patient treatment program in Tarpon Springs, FL.

Dated: June 13, 2024                        Respectfully submitted,

*/s/ Todd Foster*
**TODD FOSTER**
Florida Bar No.: 0325198
tfoster@tfosterlawgroup.com
**MELISSA KWITKO**
Florida Bar No.: 1025759
mkwitko@tfosterlawgroup.com
**KEVIN DARKEN**
Florida Bar No.: 90956
kdarken@tfosterlawgroup.com
**TODD FOSTER LAW GROUP**
601 Bayshore Blvd., Suite 615
Tampa, FL 33606
Telephone: (813) 565-0600
*Attorneys for the Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I filed the foregoing with the Clerk of Court for the Middle District of Florida on this 13th day of June 2024, by uploading it to the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>*/s/ Todd Foster*</u>
**TODD FOSTER**

36